**In the Matter of Joseph WAMBACH, Sr., et al., Bankrupts.**

**Nos. 71 B 1171, 71 B 1172, 71 B 1173 (consolidated).**

United States District Court, N. D. Illinois, E. D.

May 5, 1972.

Jerome S. Wald, Chicago, Ill., for the bankrupts.

Kevin Gillogly, Chicago, Ill., for receiver and trustee.

Richard J. Riordan and Robert Keith Larson, Riordan, Linklater, Larson & Bruckert, Chicago, Ill., for Palatine National Bank.

## MEMORANDUM OPINION

DECKER, District Judge.

This is a petition for review of an order entered by a referee in bankruptcy in the above-entitled related cases. The petition seeks to have this court overturn the referee's order of February 3, 1972, which held that the claim of the Palatine National Bank (hereinafter

"bank") was not a perfected lien and therefore represented only a general, rather than a secured, claim against the bankrupts' estates.

The relevant facts adduced in the hearings before the referee are not disputed. In early January 1970 Hans Wambach and other members of his family met with C. Michael Reese and Scott Skogland, both officers of the Palatine National Bank, to discuss the possibility of a loan from the bank to the Wambach Corporation. At that meeting, the Wambachs proposed that their apartment building located at 4701 N. Campbell, Chicago, Illinois, as well as the assets of the corporation be used as collateral for any loans which might be made.

Subsequently, on January 26, 1970, Joseph Wambach, Sr., Hermine Wambach, Joseph Wambach, Jr., and Hans Wambach personally guaranteed all existing and future loans made to Wambach Corporation. Three days later, the Wambach Corporation, by Joseph Wambach, Sr., Hans Wambach, and Joseph Wambach, Jr., as officers, made and executed a collateral installment note to Palatine National Bank in the amount of $33,180.00. The only collateral described in the note was the machinery and equipment of the Wambach Corporation and the proceeds thereof. No mention was made of the apartment building, and no action was taken to implement the agreement made with the bank until late in February 1970, when Joseph Wambach, Sr., Hermine Wambach and Joseph Wambach, Jr., made, executed and delivered to Palatine National Bank a trust agreement denominated Palatine National Bank Trust # 270, a deed in trust pursuant thereto and an assignment of beneficial interest in that trust. The assignment of beneficial interest dated February 23, 1970, which was absolute on its face, was accepted by "C. Michael Reese, trustee". Reese was an employee of the bank who was to serve as trustee on behalf of the bank in the event that any loan might be in default and the collateral would have to be liquidated.

Later on May 12, July 28 and September 30, 1970, the Wambach Corporation, by its officers,[1] executed three other collateral notes to the bank in the amounts of $16,798.80, $58,800.00 and $5,582.34, respectively. Unlike the first note, those notes, in addition to describing certain equipment, inventory and accounts receivable of the Wambach Corporation as collateral, also provided, "assignment of beneficial interest in Palatine National Bank Trust No. 270".

Further, under date of July 20, 1970, a financing statement, as required by Ill.Rev.Stat. Chap. 26, § 9–101 *et seq.*, was filed with the Secretary of State. By its terms, this statement, signed by all three of the named debtors, stated that the Palatine National Bank was the secured party, and named Hermine Wambach, Joseph Wambach, Sr., and Joseph Wambach, Jr., as debtors, with the provision that the financial statement covered "assignment of beneficial interest in Trust No. 270 at Palatine National Bank in Palatine, Illinois".

As of January 9, 1971, the May 12, 1970, note was paid off. However, there existed balances of $16,842.33 on the January 29, 1970, note, $44,236.93 on the July 28, 1970, note, and $5,582.34 on the September 30, 1970, note. On April 6, 1971, the bank intervened in the bankruptcy proceeding, which was filed on February 25, 1971, seeking leave to foreclose its interests.

Based on the foregoing facts, the referee held that there was no valid "security agreement" between the Wambachs and the bank, and therefore the bank's lien was not perfected. I cannot agree for the reasons hereinafter stated in this opinion.

As to the requirement of a valid security agreement, referred to by the refer-

---

1. The three officers were Joseph Wambach, Sr., Joseph Wambach, Jr., and Hans Wambach. Joseph Wambach, Sr., did not sign the last note.

ee, the Uniform Commercial Code states that a security agreement is "an agreement which creates or provides for a security interest", Ill.Rev.Stat. chap. 26, § 9–105(h), and that although no particular words or phrases must be used, the security agreement must, in order to be valid, be (1) a writing (2) signed by the debtor (3) which contains a description of the collateral or kinds of collateral. Ill.Rev.Stat. chap. 26, § 9–203, and Comment 1 of the Uniform Commercial Code Comments under that section. The intent of these provisions is to reduce the formal requirements for the creation of a security interest, Ill.Rev.Stat. chap. 26, § 9–203, Comments 1 and 5 of the Uniform Commercial Code Comments.

 Thus, the basic question presented to the referee and argued here on appeal is whether the absolute assignment of the beneficial interest, either standing alone or in conjunction with the collateral notes and the other documents relating to the transaction, fulfills the letter and intent of Section 9–203's requirements. The referee, looking only at the four corners of the assignment of beneficial interest, determined that it was insufficient to qualify as a security agreement because it contained no terms and did not describe the collateral. The referee apparently took the view that the single document creating the security interest must contain all of the details relating to the agreement. I can find no language in the Code stating that the security agreement must be defined as such or that its terms must be included in a single document. In fact, the Code indicates otherwise.

In the general definition section, in Section 1–201 subsection (3), the word "agreement" is defined as follows:

"'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade . . ."

In a number of situations, where courts have been called upon to apply these provisions of the Code, a variety of documents, both singly and in combination, have been held to qualify as security agreements. In re Auto Center Parts, 6 UCC Rep.Serv. 398 (C.D.Cal. 1968) (note and financing statement); Evans v. Everett, 279 N.C. 352, 183 S. E.2d 109 (1971) (financing statement and note); In re Carmichael Enterprises, Inc., 334 F.Supp. 94 (N.D.Ga.1971) (letter and financing statement); In re Fibre Glass Boat Corp., 324 F.Supp. 1054 (S.D.Fla.1971) (letter and financing statement); *contra,* Safe Deposit Bank and Trust Co. v. Berman, 393 F.2d 401 (1st Cir. 1968) (series of notes and limited security agreement). At least one commentary agrees that a well-drafted note may in itself constitute a security agreement. Kenoe, Land Trust Financing and the Uniform Commercial Code, Chicago Bar Record, Vol. 52, p. 419, p. 424 (June 1971).

In the light of these authorities, it becomes necessary to take a second look at the entire transaction. When the first loan was made by the bank to the Wambach Corporation, the now bankrupt debtors personally guaranteed not only the loan then made but all future loans to be made to the Wambach Corporation. At the same time, they executed their assignment of beneficial interest to be held by the bank as collateral security for the first loan, although the first note did not specifically mention this collateral. When the next three loans were made subject to the continuing personal guarantee, each one provided:

"To secure payment of this note and all other liabilities of the undersigned to the Bank or other holder hereof, howsoever created, whether now existing or hereafter arising, whether direct or indirect, whether absolute or contingent, and whether due or to become due (this note and all other liabilities being hereinafter called the 'obligations'), the undersigned pledges to the Bank and grants to the Bank a security interest in all property and interests therein of the undersigned of any kind, now or at any time hereafter assigned, transferred or deliv-

ered to or left in the possession of the Bank by or for the account of the undersigned, including but without limitation all property described in security agreements executed by the undersigned, receipts for collateral from time to time issued by the Bank to or for the account of the undersigned and the following described property (said property and any substitutions therefor and any additions thereto being hereinafter called the 'Collateral') ; to-wit:"

Following this clause, each note expressly referred to the assignment of beneficial interest as part of the collateral.

Although Hermine Wambach did not sign these notes, she joined the other debtors in signing the financial statement of July 20, 1970, clearly recognizing the fact that the assignment of beneficial interest was held by the bank as security for the loans she had guaranteed.

The referee himself recognized that the debtors intended to create a security interest in the assignment and that there would be "no question" that the bank would have a valid security interest against the Wambachs. Having made this concession, it is difficult to understand the reason why the referee refused to protect the bank in the security which the Wambachs admittedly agreed to furnish. The referee's decision could not have been based on the absence of the statutory notice because by filing the financial statement, the bank fully complied with the notice provisions of the Code.

 Based on the foregoing, it is this court's conclusion that in this instance the notes, the guarantee, the absolute assignment and the financing statement, when construed together, are conclusive evidence that the beneficial interest in the land trust was to serve as collateral for the various loans, and that these documents collectively satisfied the require-

ments of Section 9–203, thereby constituting a valid security interest.[2]

Accordingly, the referee's order of February 3, 1972, is hereby ordered vacated, and this cause is ordered remanded to the referee for further proceedings not inconsistent with this opinion.

---

2. Banks and lending institutions would be well advised to use a single form of security agreement, and thereby avoid bur-

dening referees and courts with this type of unnecessary problem.